IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

REGINALD L. CANNON,               :        HON. JEROME B. SIMANDLE

              Plaintiff,          :        Civil No. 09-4612 (JBS/AMD)

      v.                          :

BRADBURY BURIAL VAULT CO.,        :             **OPINION**
INC.,                             :

              Defendant.          :

APPEARANCES:

Michael H. Berg, Esq.
BERG & PEARSON, PC
59 North Broad Street
Woodbury, NJ 08096
     Attorney for Plaintiff Reginald L. Cannon

Amar Anand Agrawal, Esq.
Andrew L. Unterlack, Esq.
Scott Howard Marcus, Esq.
SCOTT H. MARCUS & ASSOCIATES
121 Johnson Road
Turnersville, NJ 08012
     Attorneys for Defendant Bradbury Burial Vault Co., Inc.


**SIMANDLE**, District Judge:


I.  **INTRODUCTION**

     This matter is before the Court on Plaintiff Reginald L.

Cannon's ("Plaintiff") motion for partial summary judgment.

[Docket Item 18.]  Defendant Bradbury Burial Vault Co.

("Defendant" or "Bradbury Burial") has filed a cross-motion for

summary judgment in opposition to the Plaintiff's motion.[1]
[Docket Item 21.]

The Plaintiff argues for partial summary judgment as to Count I of his complaint alleging racial harassment in violation of Title VII, 42 U.S.C. 2000e, *et seq.* The Plaintiff maintains that the Defendant subjected the Plaintiff to a racially hostile work environment and there are no genuine issues of material fact to dispute Plaintiff's prima facie case. The Defendant argues that the Plaintiff has failed to show that the racial discrimination complained of was pervasive and severe and the Defendant further argues that there is no respondeat superior liability in this case. Therefore, the Defendant cross moves for summary judgment dismissing this count of the Plaintiff's complaint.

For the reasons discussed herein, the Court finds that there are genuine issues of material fact which preclude summary judgment and both motions will be denied.

## II.  BACKGROUND

### A. Facts and Procedural History

The Plaintiff initially worked for the Defendant from

_____

[1] The Plaintiff argues that the court should dismiss Defendant's cross-motion because it was filed out of time. While the Defendant's cross-motion was untimely by 7 days pursuant to L.Civ.R. 7.1(d)(5), there is no evidence of prejudice to the Plaintiff and the Plaintiff has fully briefed opposition to the Defendant's cross-motion. Therefore, the court will consider the cross-motion in this opinion.

approximately 1995-1997.  (Reply Affidavit of Reginald Cannon ¶ 2.)  The Plaintiff then returned to work for the Defendant as a laborer in 2004 and continues to work for the Defendant through the present time.  (Pl.'s Ex. 14, Certification of Reginald L. Cannon ("Cannon Cert.") at ¶¶ 46, 47, 57).[2]  The Defendant is in the business of preparing concrete burial vaults for funeral directors for delivery to cemeteries.  (Pl.'s Ex. 1, Deposition of Peter Giannone ("Giannone Dep.") at 11:8-11).  The Defendant employs approximately 25 individuals.  (Giannone Dep. at 12:2-13:21.)

Mr. Lawrence Kenney is the President and 51% owner of Defendant Bradbury Burial.  (Pl.'s Ex. 3, Deposition of Lawrence Kenney ("Lawrence Kenney Dep.") at 79:21-80:3.)  Mr. William Kenney is the Vice President and 49% owner of Defendant Bradbury Burial.  (Lawrence Kenney Dep. at 80:4-80:11).  William Kenney also supervises employees of the Defendant.  (Pl.'s Ex. 2, Deposition of William T. Kenney ("William Kenney Dep.") at 8:22-9:23).  Mr. Peter Giannone is the Plant Manager for the Defendant and is in charge of the drivers and works with William Kenney to

---

[2] The Defendant argued in its brief that the Plaintiff's certification was unsigned and therefore could not be relied upon by the court.  However, after reviewing the certification, the Court finds that it is both signed by the Plaintiff and notarized.  In addition, the Plaintiff's certification is limited to statements of fact within the Plaintiff's personal knowledge. Therefore, the Plaintiff's certification is properly considered by the court in deciding these motions.  See L. Civ. R. 7.2(a).

supervise the employees in the plant.  (Giannone Dep. 10:24-11:7 and Lawrence Kenney Dep. 85:5-15.)  Mr. Gary Mason is the shop steward and also serves as the union representative for the union workers.  (Lawrence Kenney Dep. at 86:1-4.)  Mr. Mason is not a manager.  (Giannone Dep. 16:9-13.)

The only managers and supervisors employed with the Defendant are William Kenney and Peter Giannone.  (William Kenney Dep. at 30:25-31:5.)  As Plant Manager, Giannone also hired employees, terminated employees and disciplined employees. (Giannone Dep. 11:16-21.)  Giannone was responsible for handling complaints of harassment.  (William Kenney Dep. 37:8-22.) Giannone was responsible for disciplining employees for using a racial term and investigating any incident when an employee used a racial term.  (William Kenney Dep. 37:16-22; 48:6-17.) Giannone's immediate supervisor was William Kenney.  (Giannone Dep. 11:25-12:3.)

Plaintiff bases the instant action on numerous events where racial terms were used during his employment from 2004 to 2009. These events primarily involve William Hazel and Amin Vasquez who were coworkers of the Plaintiff and admittedly not managers or supervisors.  On two occasions, these incidents escalated to physical assault.

On or about May, 2004, shortly after the Plaintiff began his employment with the Defendant, William Hazel called the

4

Plaintiff: "black bastard," "jigaboo," and "you dumb black people." (Cannon Cert. ¶ 2.)  Hazel denies making any of these statements.  (Def.'s Ex. H, William Kenney Dep. 9:25-11:12.)  The Plaintiff complained to Giannone within a day or so of Hazel using these terms.  (Cannon Cert. ¶ 2.)  Giannone denies speaking to the Plaintiff about this alleged incident.  (Def.'s Ex. C, Giannone Dep. 53:8-54:3.)  Hazel was never reprimanded for using any words, racial or otherwise, while employed with the Defendant. (Pl.'s Ex. 5, Deposition of William Hazel ("Hazel Dep.") 9:16-24.)

In April 2006, the Plaintiff heard Amin Vasquez state while at work, "I ain't worried bout nothing but these gringos and 'niggers' here."  (Cannon Cert. ¶ 4-5.)  The Plaintiff immediately went to Giannone to complain about Vasquez's racial epithet but Giannone allegedly simply laughed.  (Cannon Cert. ¶ 6.)

The next day, the Plaintiff was involved in a physical altercation with Vasquez.  (Cannon Cert. ¶ 4.)  Vasquez stated to the Plaintiff "f*ck you 'nigger.'" (Cannon Cert. ¶ 8.)  The Plaintiff then asked Vasquez what he said and in response, Vasquez stated that "you are a 'nigger.'" (Cannon Cert. ¶ 9.) The Plaintiff again asked Vasquez what he was calling him and Vasquez responded by approaching the Plaintiff, pointing his finger repeatedly in the Plaintiff's face and stating "f*ck you

'nigger.'"   (Cannon Cert. ¶ 10.)   The Plaintiff felt threatened.
(Cannon Cert. ¶ 10.)   Then the Plaintiff and Vasquez engaged in a
physical altercation.   (Cannon Cert. ¶ 11.)

    Coworkers Matthew Gramkowski, Ayasir Sanabria and Erik
Justice broke up the fight.  (Pl.'s Ex. 6, Deposition of Matthew
Gramkowski ("Gramkowski Dep.") 129:16-130:2.)  After this fight,
Giannone asked Vasquez and the Plaintiff what happened, and the
Plaintiff advised that Vasquez called the Plaintiff a "nigger"
four times.  (Cannon Cert. ¶ 12.)  Mr. Sanabria also told
Giannone that Vasquez called the Plaintiff a "nigger."  (Pl.'s
Ex. 7, Certification of Ayasir Sanabria ("Sanabria Cert.") at ¶
4.)  Vasquez was not disciplined for calling the Plaintiff a
"nigger."  (Sanabria Cert. at ¶ 6.)  After this incident, Mr.
Giannone stated to both the Plaintiff and Mr. Vasquez that "I
could fire both of you or you can both go back to work." (Cannon
Cert. ¶ 14.)

    Giannone issued a warning to the Plaintiff for calling Mr.
Vasquez a "spic." (Def.'s Ex. J.)  While Giannone denied speaking
to the Plaintiff about this incident in his deposition, Mr.
Giannone issued a write up of the situation on April 21, 2006,
stating: "Reggie admitted to me that he called Amin a spick cause
Amin called him a Nigger first.  When Amin was asked, Amin denied
the name calling and didn't pay no attention to Reggie's Remark."
(Giannone Dep. 53:21-54:3; Def.'s Ex. J.)

Several days later, during work hours, the Plaintiff asked
Vasquez not to use his trowel.  (Cannon Cert. ¶ 17.)  Vasquez
threw the trowel on the ground and said, "I don't need to use no
'nigger' trowel."  (Cannon Cert. ¶ 18.)  The Plaintiff complained
about the incident to Giannone and Giannone again did not
discipline Vasquez.  (Cannon Cert. ¶ 18.)

In January 2007, Hazel, William Kenney, Sanabria and
Plaintiff were in the office.  When the Plaintiff left the
office, Hazel said to Kenney, "look, the little 'coon' thinks
we're talking about him." (Sanabria Cert. at ¶ 8.)  Hazel then
spoke about the "'spics' at the cemetery." (Sanabria Cert. ¶ .)
Kenney did not correct Hazel and only laughed.  (Sanabria Cert. ¶
8.)  Sanabria then told the Plaintiff Hazel had called him a
'coon' in front of Kenney and Kenney laughed.  (Cannon Cert. ¶ 19
and Sanabria Cert. ¶ 8.)  Hazel denies using or knowing the word
"coon." (Hazel Dep. 8:21-9:12.)

The Plaintiff complained to Gary Mason, the shop steward,
and Giannone after learning about Mr. Hazel's 'coon' comment.
(Cannon Cert. ¶ 21; Giannone Dep. 54:18-55:23.)  The Plaintiff
was upset and told Giannone the he never believes the Plaintiff
because he did not do anything about Vasquez.  (Giannone Dep.
55:2-23.)  Giannone spoke to Hazel and Hazel denied using the
coon word.  Kenney told Giannone he did not remember whether
Hazel used the coon word or not.  (Giannone Dep. 55:18-19.)

7

However, Kenney told Gary Mason he did believe he heard Hazel say the term 'coon.'  (Certification of Gary Mason at ¶ 4.) Hazel was never reprimanded for using any words, racial or otherwise, while employed with the Defendant.  (Hazel Dep. 9:16-24.)

In February 2007, Vasquez again called the Plaintiff a "nigger." (Cannon Cert. ¶ 22.)  Within a day, the Plaintiff complained about the incident to Giannone.  (Cannon Cert. ¶ 22 and Giannone Dep. 20:9-21:10.)  Vasquez was not disciplined. (Cannon Cert. ¶ 23.)

The Plaintiff also complained to Giannone that Vasquez threatened him.  (Giannone Cert. 61:3-5.)  The Plaintiff told Giannone if Vasquez attacked him, he would hit Vazquez. (Giannone Cert. 61:8-11; 62:14-22.)  Giannone asked Vasquez whether he threatened the Plaintiff and Vasquez responded no. (Giannone Cert. 61:3-17.)  Giannone did not notify Lawrence Kenny or William Kenney of this incident and did not discipline Vasquez.  (Giannone Cert. 62:7-12.)  However, Giannone issued a written warning to the Plaintiff for threatening a coworker. (Giannone Cert. 61:3-62:25.)  The Plaintiff grieved the written warning to the union and it was subsequently withdrawn. (Declaration of Lawrence Kenney ¶ 26.)

Following these incidents, a notice was given to all of the Defendant's employees with their pay checks on March 1, 2007. This notice stated that the "Company will not and does not

8

tolerate harassment of employees in the work place or any work related situation!!" (Pl.'s Ex. 10.)  The notice advises that harassment will lead to an immediate dismissal from work.  (Pl.'s Ex. 10.)

In the summer of 2007, the Plaintiff and Vazquez were involved in another altercation.  (Cannon Ex. 14 ¶ 25.)  During work hours, Vazquez walked by the Plaintiff and stated, "you think you are Tyson."  The Plaintiff responded, "I knocked you out."  (Cannon Ex. 14 ¶ 26.)  Vazquez then stated, "f*ck you 'nigger'" and stood in a fighting stance with a spike hammer in his hand.  (Cannon Ex. 14 ¶ 27.)  The Plaintiff was fearful that Vasquez would strike him with the hammer and cause serious bodily harm.  (Cannon Ex. 14 ¶ 29.)  The Plaintiff took off his shirt, wrapped it around his hand and stood in a protective stance. (Cannon Ex. 14 ¶ 30.)  William Kenney saw this exchange and advised the Plaintiff and Vasquez to stop it.  (Cannon Ex. 14 ¶ 31.)  Vasquez then threatened to take the matter outside. (Cannon Ex. 14 ¶ 32.)

Later that day, Vasquez and the Plaintiff walked outside and Vasquez began threatening the Plaintiff with a sharpened screwdriver.  (Cannon Ex. 14 ¶ 33.)  William Kenney told them to break it up and go back work.  (Cannon Ex. 14 ¶ 34.)

At the end of the day, the Plaintiff went to his car in the parking lot.  (Cannon Ex. 14 ¶ 35.)  Vasquez and the Plaintiff

9

again got into an argument and William Kenney demanded they not fight on the company's property. (Cannon Ex. 14 ¶ 35; Gramkowski Dep. 134:15-17.) William Kenney asked Vasquez and the Plaintiff, "why are you two fighting?" and the Plaintiff responded "because you keep letting Amin call me a 'nigger.'" (Cannon Ex. 14 ¶ 36.) Vasquez then responded in the presence of William Kenney, "because you are a 'nigger.'" (Cannon Ex. 14 ¶ 37.) William Kenney then walked away while Mr. Vasquez and the Plaintiff engaged in a physical altercation in the parking lot. (Cannon Ex. 14 ¶ 38.) Giannone was also present and told the Plaintiff and Vasquez to take their fight around the back of the building and that once they were finished fighting, he did not want to hear anymore about the situation. (Cannon Ex. 14 ¶ 39.) Vasquez and the Plaintiff then proceeded to fight around the back of the property. (Cannon Ex. 14 ¶ 40.) Vasquez was never reprimanded as a result of this incident. (Cannon Ex. 14 ¶ 41.)

The Defendant denies that William Kenney or Giannone participated or witnessed this altercation. The Defendant cites to the deposition of Matthew Gramkowski, who testified that the altercation took place but he was unsure whether William Kenney or Giannone were present at the fight. (Gramkowski Dep. 134:10-23). Mr. Gramkowski also testified that he did not witness the fight. (Gramkowski Dep. 133:25-134:3.) Mr. Gramkowski explained that he was not present at the fight "because they [Plaintiff and

Vasquez] argued for a little bit then they took it outside and we were told just to let it go . . . I think Kenney told us to leave it alone, Bill Kenney and then they just told us to let them go at it to get it out of their system." (Gramkowski Dep. 133:9-21.)

In February 2009, several employees were listening to the radio while at work. (Cannon Ex. 14 ¶ 42.) A coworker, Joe LeDonne, called the R&B radio station that was playing at the time "jungle music" in the presence of William Kenney. (Cannon Ex. 14 ¶ 42.) On one occasion, William Kenney recalled Mr. LeDonne referring to hip hop music as "jungle music." (William Kenney Dep. 85:4-86:11.) The Plaintiff states that William Kenney did nothing except give the middle finger to coworkers Gramkowski and Sanabria when the R&B station was turned back on. (Cannon Ex. 14 ¶ 43.) William Kenney testified during his deposition that he told LeDonne that using the term "jungle music" was inflammatory and inappropriate. (William Kenney Dep. 87:1-7.) The Plaintiff, coworkers Sanabria, Gramkowski, and Erik Justice complained to William Kenney about LeDonne referring to rap music as "jungle music." (Gramkowski Dep. 143:21-146:15.) LeDonne was never disciplined for using the term "jungle music" aside from Kenney's verbal reprimand. (William Kenney Dep. 16-19.) The Defendant disputes whether the Plaintiff was present for this incident, whether "jungle music" referred to hip hop and

11

whether any coworkers complained to William Kenney about the phrase "jungle music." (William Kenney Dep. 85:4-87:19.)

In addition to the above incidents, the Plaintiff also heard Giannone tell an employee named Larry that "you are acting like a 'nigger,'" but the Plaintiff could not recall the date this statement was made.  (Cannon Ex. 14 ¶ 44.)  William Kenney also told Sanabria that he "considers black people niggers," and further stated, "that's what me and my friends refer to them as." (Sanabria Cert. ¶ 7.)

It is disputed whether the Defendant maintained a policy to address harassment in the workplace.  Giannone testified during his deposition that "the company don't have no policy on how to handle discrimination, calling names, whatever." (Giannone Dep. 73:15-17.)  Giannone further testified that he was unaware of any individual who spoke to the employees of the Defendant to advise them as to what an employee should do if they were subjected to racial harassment at Bradbury.  (Giannone Dep. 48:25-49:3.) Giannone also stated he did not know if an employee knew what to do if subjected to racial harassment at work.  (Giannone Dep. 48:9-14.)  In addition, Lawrence Kenney testified that the Defendant did not have its own policy relative to the prevention of racial harassment at Bradbury.  (Lawrence Kenney Dep. 106:18-108:5.)

However, Lawrence Kenney also testified that if an employee

had a problem with racial harassment, he should file a grievance
with the union in accordance with the union contract.  (Lawrence
Kenney Dep. 91:20-22.)  Lawrence Kenney reviewed the union
contract at his deposition and stated that if an employee has
reported an incident of racial discrimination to a manager, the
employee should be given the option of filing a grievance with
the union.  If the employee has no interest in filing a
grievance, then the manager has the option of talking about the
problem with the employee to see if they can resolve it.
(Lawrence Kenney Dep. 103:13-25.)  However, it is "always
available to the employee to talk to the shop steward."
(Lawrence Kenney Dep. 104:1-2.)  The collective bargaining
agreement[3] between Bradbury and the union states in pertinent
part:

> There shall be no discrimination by the Employer
> against his employees because of Union activities;
> nor shall there be any discrimination against any
> employee because of race, color, creed, sex, age or
> nationality, in the placement and retention of
> employment, or in the hours, wages or working
> conditions of the employees.

(Def.'s Exs. A and B, Collective Bargaining Agreement between
Bradbury Burial Vault Company, Inc. and Teamsters Local Union

---

[3] The Defendant attaches two collective bargaining
agreements.  The first agreement was effective from June 1, 2007
up to and including May 31, 2007.  The second agreement is
effective June 1, 2007 and remains effective up to and including
May 31, 2012.  Both agreements contain identical non-
discrimination language.

676, Article 15.)

It is undisputed that Giannone never had any training with the Defendant relative to racial harassment.  (Giannone Dep. 74:20-22.)  It is also undisputed that Giannone was never provided with any written materials relative to racial harassment while employed with the Defendant.  (Giannone Dep. 74:23-75:1.)

In terms of handling allegations of racial harassment, Giannone testified that unless he specifically heard the racial epithet, he would not believe it occurred.  Specifically, when discussing the Plaintiff's February 2007 incident with Vasquez, Giannone testified:

> Q: Now, Mr. Vasquez, was he written up for calling Mr. Cannon a nigger on that February 2007 incident?
> A: No, he was not.
> Q: Why not?
> A: Because Amin told me he did not call him the "n" word where Reggie admitted to me that he did call Amin a spick.  And I said well, thanks for being honest and that's when I wrote up Reggie on that one.
> Q: Did it have any --
> A: And that's the only reason why I didn't turn it into the union.
> Q: The fact that Mr. Justice and Mr. Sanabrea [sic] confirmed that he heard Mr. Vasquez call Mr. Cannon a nigger did that have any weight in your decision?
> A: No, no weight whatsoever.
> Q: Did you believe Mr. Cannon, Mr. Sanabrea [sic], and Mr. Justice when they said that they heard Mr. Vasquez call him a nigger?
> A: I only believe what I hear so no, I do not believe them.
> Q: So unless you specifically heard it you would not believe it?
> A: That's correct.
> Q: Is that accurate?
> A: That's accurate yes.

14

(Giannone Dep. 24:18-25:18.)  Giannone placed a notice in
employees pay checks regarding the Defendant's no tolerance
harassment policy.  These notices were placed in April 2006 and
March 2007. (Giannone Dep. 47:11-22.)  In regard to the March
2007 notice, Giannone testified that he disseminated the notice
to "try to make the workplace a little more safety [sic] because
the employees were also saying that, you know, the company is
unsafe to work for." (Giannone Dep. 32:9-12.)  Giannone
testified these were the only two times that a harassment policy
was disseminated amongst employees. (Giannone Dep. 47:20-22.)

The Plaintiff thought of quitting his job on many occasions
and it became increasingly difficult for the Plaintiff to work in
a work environment where these harassing incidents continued to
occur. (Cannon Cert. ¶ 45.)  The Plaintiff suffered many
sleepless nights as a result of the racial harassment and the
Plaintiff feared for his own personal safety. (Cannon Cert. ¶
51.)  When Vasquez quit working with Bradbury in approximately
January 2008, the Plaintiff began to feel safe at his job.
(Cannon Cert. ¶ 52.)

The Plaintiff filed a complaint with the EEOC.  The EEOC
then issued the Plaintiff a right to sue letter on June 12, 2009.
(Pl.'s Ex. 11.)  The Plaintiff brought the instant action on
September 9, 2009. [Docket Item 1.]  Count One of Plaintiff's
complaint alleges racial harassment in violation of Title VII and

specifically claims that the Defendant maintained a hostile work environment.  Count Two of Plaintiff's complaint alleges unlawful retaliation in violation of Title VII.

## B. The Instant Motion

The Plaintiff filed the instant motion for partial summary judgment as to Count One of his complaint. [Docket Item 18.]  The Plaintiff argues there is no genuine issue of material fact as to whether the Defendant subjected the Plaintiff to a hostile work environment in violation of Title VII.  The Plaintiff maintains that he suffered discrimination because he is a member of a protected class; the discrimination was severe and pervasive; the discrimination detrimentally affected him; the discrimination would have detrimentally affected a reasonable person in the Plaintiff's protected class; and the Defendant is liable for the discriminatory acts of Mr. Vasquez and Mr. Hazel pursuant to respondeat superior because the Defendant failed to provide a reasonable avenue for complaints of racial harassment or, alternatively, the Defendant knew or should have known of the harassment and failed to take prompt appropriate remedial action. Therefore, the Plaintiff argues that summary judgment as to Count One is appropriate.

The Defendant filed a cross-motion for summary judgment in opposition.  The Defendant maintains that the "Plaintiff has not shown any discriminatory acts, let alone 'pervasive and regular'

16

acts." (Def. Br. in Opp. at 7.)  In addition, the Defendant argues that it cannot be held vicariously liable for the conduct of Vasquez and Hazel because their alleged actions were outside the scope of their employment and the Defendant had in place a well-publicized anti-harassment policy with grievance procedures pursuant to the collective bargaining agreement to properly respond to the Plaintiff's complaint of harassment.  Therefore, the Defendant argues that summary judgment should be granted in its favor and the Plaintiff's complaint should be dismissed.

## III.  DISCUSSION

### A.  Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law.  Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.  Id.

Summary judgment will not be denied based on mere allegations or denials in the pleadings; instead, some evidence

17

must be produced to support a material fact.  Fed. R. Civ. P.
56(c)(1)(A); United States v. Premises Known as 717 S. Woodward
Street, Allentown, Pa., 2 F.3d 529, 533 (3d Cir. 1993).  The
nonmoving party must "do more than simply show that there is some
metaphysical doubt as to the material facts." Matsushita Elec.
Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).

> [Rule 56] mandates the entry of summary judgment,
> after adequate time for discovery and upon motion,
> against a party who fails to make a showing
> sufficient to establish the existence of an element
> essential to that party's case, and on which that
> party will bear the burden of proof at trial.  In
> such a situation, there can be "no genuine issue as
> to any material fact," since a complete failure of
> proof concerning an essential element of the
> nonmoving party's case necessarily renders all
> other facts immaterial.

Celotex, 477 U.S. at 323.

However, the Court will view any evidence in favor of the
nonmoving party and extend any reasonable favorable inferences to
be drawn from that evidence to that party.  Hunt v. Cromartie,
526 U.S. 541, 552 (1999).  See also Scott v. Harris, 550 U.S.
372, 378 (2007) (The district court must "view the facts and draw
reasonable inferences in the light most favorable to the party
opposing the summary judgment motion.").

In Title VII cases, "courts must view summary judgment with
special caution, because impermissible discriminatory intent and
proof of disparate treatment can be difficult to establish."
Swingle v. Henderson, 142 F. Supp. 2d 625, 631 (D.N.J. 2001).

The summary judgment standard does not change when the
parties have filed cross-motions for summary judgment.  See
Appelmans v. City of Phila., 826 F.2d 214, 216 (3d Cir. 1987).
Cross-motions for summary judgment:

> are no more than a claim by each side that it alone is
> entitled to summary judgment, and the making of such
> inherently contradictory claims does not constitute an
> agreement that if one is rejected the other is
> necessarily justified or that the losing party waives
> judicial consideration and determination whether
> genuine issues of material fact exist.

Transportes Ferreos de Venezuela II CA v. NKK Corp., 239 F.3d
555, 560 (3d Cir. 2001) (citing Rains v. Cascade Indus., Inc.,
402 F.2d 241, 245 (3d Cir. 1968)).  If review of cross-motions
for summary judgment reveals no genuine issue of material fact,
then judgment may be entered in favor of the party deserving of
judgment in light of the law and undisputed facts.  See Iberia
Foods Corp. v. Romeo Jr., 150 F.3d 298, 302 (3d Cir. 1998)
(citing Ciarlante v. Brown & Williamson Tobacco Corp., 143 F.3d
139, 145-46 (3d Cir. 1988)).

**B. Hostile Work Environment Claim**

Under 42 U.S.C. § 2000e-2(a)(1), it is "an unlawful
employment practice for an employer . . . to discriminate against
any individual with respect to his compensation, terms,
conditions, or privileges of employment, because of such
individual's race . . ."  The Supreme Court has explained that

> this language is not limited to 'economic' or 'tangible'
> discrimination.    The phrase 'terms, conditions, or

19

privileges of employment' evinces a congressional intent
to strike at the entire spectrum of disparate treatment
of men and women in employment, which includes requiring
people to work in a discriminatorily hostile or abusive
environment.

Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (some

internal quotations and citations omitted).  In order to

establish a claim under Title VII for employment discrimination

based on a hostile work environment, a plaintiff must establish

(1) that he or she suffered intentional discrimination
because of race; (2) the discrimination was pervasive and
regular; (3) the discrimination detrimentally affected
the plaintiff; (4) the discrimination would detrimentally
affect a reasonable person of the same race in that
position; and (5) the existence of respondeat superior
liability.

Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1081 (3d Cir.

1996).

The pervasiveness and objective reasonableness requirements

in this standard are necessary to distinguish "simple teasing,

offhand comments, and isolated incidents (unless extremely

serious)," which are insufficient to establish a hostile work

environment claim, from "discriminatory changes in the terms and

conditions of employment," which are actionable under Title VII.

Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)

(internal quotations and citations omitted).  In other words,

"[t]hese standards for judging hostility are sufficiently

demanding to ensure that Title VII does not become a general

civility code."  Id. (internal quotations and citations omitted).

20

Recognizing that there can be no "mathematically precise test" to gauge the hostility of a workplace, the Supreme Court has instructed courts to consider the totality of the circumstances in each case, which include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23.

In this case, there are genuine issues of material fact which preclude the granting of summary judgment to either party, specifically with regard to the second and fifth elements of Plaintiff's prima facie case.

It is clear from the record that the Plaintiff suffered intentional discrimination because of his race and meets the first element.  The Plaintiff's certification, deposition testimony of Mr. Gramkowski and certification of Mr. Sanabria support a finding that the Plaintiff was called "nigger" on a number of occasions by his coworkers and this comment was intentionally discriminatory because of Plaintiff's race. "Unlike certain age-related comments which we have found too vague to constitute evidence of discrimination, the term 'nigger' is a universally recognized opprobrium, stigmatizing African-Americans because of their race." Brown v. East Miss. Elec. Power Ass'n, 989 F.2d 858, 861 (5th Cir. 1997).

21

However, there is a genuine issue of material fact with regard to whether the discriminatory acts were severe or pervasive. These acts span a five year period from 2004 to 2009. The Plaintiff, despite these discriminatory acts by his coworkers, remains an employee of the Defendant. The Plaintiff also failed to grieve a number of these incidents to the union. From these facts, a rational jury could conclude that the discrimination was not serious or pervasive.

On the other hand, the Plaintiff was involved in two physical altercations arising out of the discriminatory comments of Mr. Vasquez and the Plaintiff's membership in a protected class. One of these altercations, according to the Plaintiff's certification, was witnessed by managers Peter Giannone and William Kenney, who did not break up the fight but only encouraged Vasquez and the Plaintiff to take the fight around the back of the property. "Racially motivated physical threats are the most egregious form of workplace harassment . . . when conduct in the workplace is physically threatening to an individual because of his membership in a protected class, that conduct will almost always create a hostile work environment." Williams v. New York City Housing Authority, 154 F. Supp. 2d 820, 825 (S.D.N.Y. 2001). Giving all favorable inferences to the Plaintiff, a rational jury could find that these physical altercations were severe and created a hostile work environment.

The Defendant does not challenge that the Plaintiff was detrimentally affected by this discrimination or that a reasonable person in Plaintiff's protected class would have been detrimentally affected by these discriminatory acts.  The court finds the Plaintiff's certification provides evidence that he was indeed detrimentally affected by these discriminatory acts from 2004 to 2009.  In addition, the evidence could support a finding that a reasonable person in Plaintiff's protected class would be detrimentally affected by the discriminatory conduct of Plaintiff's coworkers during this time period.

Finally, the parties heavily dispute whether the Defendant is liable pursuant to respondeat superior.  It is undisputed by the parties that the harassors at issue in this case are Mr. Vasquez and Mr. Hazel, who are coworkers of the Plaintiff, not supervisors.  Therefore, the Defendant can only be liable under a negligence theory.

"[E]mployer liability for coworker harassment exists only if the employer failed to provide a reasonable avenue for complaint or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action."  Huston v. Procter & Gamble Paper Products Corp., 568 F.3d 100, 104 (3d Cir. 2009).  An employer can avoid respondeat superior liability by asserting an affirmative defense showing "(i) that it exercised reasonable care to prevent and correct

promptly any [] harassing behavior; and (ii) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Swingle, 142 F. Supp. 2d at 634 (internal citations omitted).  Additionally, to protect an employer from unwarranted liability for the discriminatory acts of its non-supervisor employees, the evidence must demonstrate that "the defendant knew or should have known of the harassment and failed to take prompt remedial action." Andrews v. City of Philadelphia, 895 F.2d 1469, 1486 (3d Cir. 1990); see also Kunin v. Sears Roebuck & Co., 175 F.3d 289, 294 (3d Cir. 1999).

In this case, the employer knew of the harassment complained of by the Plaintiff on at least four occasions.  Peter Giannone knew of the Plaintiff's April 2006 incident with Vasquez as evidenced by his disciplinary write up of the Plaintiff. Giannone and William Kenney knew of the "coon" incident in January 2007 as admitted in their deposition testimony.  Giannone also was made aware of the February 2007 incident with Vasquez as evidenced by his second disciplinary write up of the Plaintiff and subsequent union grievance.  Finally, William Kenney knew about the "jungle" music incident in 2009 as he discusses the incident in his deposition.  It is disputed whether William Kenney and Giannone knew of the 2008 physical assault incident. The Plaintiff maintains in his certification that both managers

24

were present and did encourage the Plaintiff and Vasquez to take their fight to the back of the property rather than break up the altercation.  Giannone and William Kenney deny being present for the brawl.  At minimum, there exists a genuine issue of material fact with regard to the employer's knowledge of the 2008 incident.

There is a genuine dispute as to the Defendant's response to the Plaintiff's complaints of harassment and whether this response was "prompt and appropriate remedial action."  <u>Huston</u>, 568 F.3d at 104.  There is no evidence in the record that Vasquez was ever formally disciplined for his persistent racially discriminatory treatment of the Plaintiff.  The record indicates that Giannone took Vasquez's denial of discriminatory conduct at face value despite the Plaintiff's complaints and witness statements corroborating the Plaintiff's account.  Nor does the record indicate that either Giannone or William Kenney advised Plaintiff of his right to grieve the discriminatory conduct of Vasquez to the union after any of the alleged incidents.  Aside from talking to the alleged harassors who uniformly denied any harassing treatment, the only other remedial action taken by the Defendant was to send two notices of a no-tolerance harassment policy to employees with their paychecks.  The first was sent in April 2006.  The second was sent in March 2007.  A jury could find that these notices were ineffective as the Plaintiff

continued to suffer harassment after the notices were issued. Further, Giannone admits to receiving no training on how to deal with claims of harassment and there is no evidence in the record that the employees received any training on harassment procedures and harassing conduct.  A rational jury could conclude that this response was not appropriate remedial action given the circumstances of Plaintiff's complaints.

There is also a genuine dispute with regard to whether the Defendant provided a reasonable avenue of complaint.  The Defendant relies heavily on the non-discrimination policy in the collective bargaining agreement to argue that there is no respondeat superior liability.  The Defendant maintains that the existence of this policy allowed employees to grieve complaints of harassment to the union and this was the procedure for an employee to seek redress.  However, Giannone testified that he was unaware of any company policy dealing with harassment and the record does not indicate that employees were ever informed of this policy nor was the Plaintiff encouraged to file a grievance with the union after his numerous complaints of harassment to Giannone.  Further, the notices sent out by the Defendant in 2006 and 2007 did not direct employees to grieve harassment complaints to the Union.

Therefore, there is a genuine issue of material fact as to whether the union policy at issue is sufficient to provide the

Defendant with an affirmative defense to respondeat superior liability.  A rational fact finder could conclude that the union policy was not meant to address harassing behavior between coworkers and that the Defendant did not have any policy in place to address workplace harassment and did not properly train employees on how to address workplace harassment.  However, the existence of the non-discrimination policy in the union agreement does create a genuine dispute which makes summary judgment inappropriate.

Finally, the Defendant's argument that it is not liable for the conduct of Vasquez and Hazel because this harassing conduct was outside the scope of their employment is questionable.  The Supreme Court has clearly held that although a harassor's conduct is "outside the scope of employment, an employer can be liable [under Title VII], nonetheless, where its own negligence is a cause of the harassment." Burlington Inus. v. Ellerth, 524 U.S. 742, 759 (1998).  "An employer is negligent with respect to [] harassment if it knew or should have known about the conduct and failed to stop it." Id.  As discussed above, there is a genuine dispute of material fact with regard to whether the Defendant was negligent and whether the Defendant failed to act promptly to prevent the harassment at issue.  Therefore, summary judgment should be denied.

**IV.  CONCLUSION**

Plaintiff's motion for summary judgment and the Defendant's cross-motion for summary judgment are denied.  Genuine issues of material fact exist with regard to whether the discrimination suffered by the Plaintiff was severe or pervasive and whether the union policy precludes a finding a respondeat superior liability. Therefore, summary judgment will be denied.

The accompanying Order will be entered.  The case will be set for trial.


**December 14, 2011**
Date

**s/ Jerome B. Simandle**
JEROME B. SIMANDLE
United States District Judge

28